Filed 7/31/14  P. v. Love CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>KEVIN LOVE et al.,<br><br>    Defendants and Appellants. | B249040<br><br>(Los Angeles County<br>Super. Ct. No. TA124894) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Pat Connolly, Judge.  Affirmed in part and reversed in part and remanded, otherwise affirmed.

David S. Adams, under appointment by the Court of Appeal, for Defendant and Appellant Kevin Terrance Love.

Linn Davis, under appointment by the Court of Appeal, for Defendant and Appellant Damonte Lockridge.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Scott A. Taryle and Pamela C. Hamanaka, Deputy Attorneys General, for Plaintiff and Respondent.

## INTRODUCTION

Defendants and appellants Kevin Love and Damonte Lockridge were charged with, among other things, two counts of premeditated, willful and deliberate attempted murder. Although the jury was not instructed on premeditation, willfulness and deliberation, the jury found the allegation to be true. Because we conclude that the failure to instruct on the allegation was prejudicial, we reverse and remand on that ground. We otherwise reject the remaining contentions concerning sufficiency of the evidence to support the attempted murder convictions and whether giving CALCRIM No. 1403 regarding gang evidence violated Lockridge's due process rights.

## FACTUAL AND PROCEDURAL BACKGROUND

### I. Factual background.

#### A. *The prosecution's case-in-chief.*

##### 1. The attempted murders.

On the late evening of August 25, 2012, brothers Jashan Bradley, Keith Bradley, and Lemont Bradley[1] were at Reggie's Liquor on Century Boulevard. Jashan and Keith arrived at the store in one car, and Lemont drove separately with his friend, Desean.[2] Lockridge, Love, and Cardessa Cardwell were also at the store. The store had seven surveillance cameras showing views from inside and outside.[3]

While Jashan and Desean were at the cash register, Lockridge told them that they were in the wrong hood, "this is 99 Mafia."[4] Lockridge told Desean to roll up his sleeves so that he could see his arms. Lemont said they didn't gang bang.

Meanwhile, Love was pacing and saying, " 'These guys don't get a pass.' " Feeling that something was going to happen, Keith told his brothers it was time to go. Keith heard Lockridge say he should " '[just] pop them,' " and Love reply, " 'No, it's

---

[1]  We refer to the brothers by their first names to avoid confusion.

[2]  The Bradley brothers testified. Desean did not testify.

[3]  Footage from the cameras was introduced into evidence.

[4]  Lemont testified that it was Love who commented about 99 Mafia.

cameras' "[5] Lemont heard Love say something like " 'Nah, man. Nah. We are on camera. . . . [D]on't do it.' "

Love and Lockridge left the store, but when Desean and Jashan went outside, defendants were there, waiting, it seemed to Jashan, for the brothers and Desean to come out. Love tried to hit Desean, who ran away. Jashan saw the outline of a gun in Love's waistband.

Lockridge blocked the way to Jashan's car, and Jashan told him they didn't want trouble. Lockridge told him to "shut the fuck up." Jashan and Keith got into their car, while Lemont got into his car. Lockridge pulled out a gun and started shooting at the passenger side of Jashan's car, where Jashan was sitting.[6] Jashan was shot in his arm. Defendants ran away together.

Police recovered 10 expended casings from the scene.

Jashan, Keith, Lemont, and Desean were not gang members, and they did not have weapons that night.

Jashan, Keith, and Lemont identified Love and Lockridge from photographic six-packs.

## 2. Gang evidence.

In August 2012, the 99 Mafia Crips had approximately 100 members. The gang has east and west side sets. The east side set's borders are Century Boulevard to the south, 98th Street to the north, Central Boulevard to the west, and Success Avenue to the east. The gang's common rivals are Hat Gang Crips and the Be-Bop Bloods, although 99 Mafia Crips will feud with all Blood gangs.

The 99 Mafia Crips engage in vandalism (commonly, tagging and graffiti), thefts, burglaries, street robberies, selling narcotics (specifically, PCP and cocaine), and shootings that result in attempted murders and murders. Shootings usually occur "for

---

[5]     Although Keith testified he told the detective and first responders that Lockridge made this comment, the parties stipulated there was no documentation of it.

[6]     Keith was driving the car.

3

offensive reasons, to act against other people that are not from the neighborhood, or rival gangs, or even defensive reasons, when other gangs come through their neighborhood, to intimidate them and shoot at them, to get them out of their neighborhood and make them afraid of coming back."

Detective Erik Shear has known Lockridge for five or six years. The detective heard about him from uniform gang officers, and he had contact with him in the neighborhood. Lockridge, who is known as C-Rock, admitted his gang membership in the detective's presence. Detective Shear has also known of Love for five or six years. Love, who is known as Slim or Big Slim or Spook, admitted his gang membership to the detective multiple times. Both Love and Lockridge have gang-related tattoos.

Based on a hypothetical modeled on the facts of this case, Detective Shear said it was his opinion that such a crime was committed for the benefit of, at the direction of, and in association with the 99 Mafia Crips.

## B.    Defense case.

Lockridge testified. A special education student, Lockridge stopped going to school after eighth grade. Growing up, members of his family were in gangs, including his uncle and cousin who were in 99 Mafia. Lockridge joined the gang when he was 13.

The night of the shooting, he went to Reggie's liquor store with Cardessa Cardwell and Love.[7] Lockridge was intoxicated, having consumed alcohol and marijuana. While at the cash register, he noticed Desean, who had a tattoo on his face. Because he was thinking of getting a tattoo on his face, Lockridge asked Desean if getting the tattoo had hurt and whether he had any other tattoos. Desean lifted his sleeves to show Lockridge his tattoos. Lockridge did not bang on Desean, ask where he was from, or refer to 99 Mafia. Lockridge never spoke to the Bradley brothers.

Lockridge and Love went outside to wait for Cardwell. Desean, who had a "past experience" with Love, spat in Love's face. Lemont told Jashan to " 'pop the trunk' " and " 'grab the gun' " or " 'burner.' " Lockridge saw Jashan or Lemont quickly open and

---

[7]     Lockridge happened to run into Love, and they decided to walk to Reggie's together.

4

close the trunk. Lockridge also saw Jashan near his car, bending down as if to grab something. To protect himself, Lockridge started to shoot, although he didn't aim at anybody in particular.[8] He did not intend to kill anyone.

Lockridge had been a member of 99 Mafia. But, by the time of the shooting, he had dropped out of the gang, because he was going to be a father.

When Lockridge was interviewed, he did not tell the police any of this because he didn't want to be labeled a snitch.

## II. Procedural background.

On May 2, 2013, a jury found Lockridge guilty of counts 1 and 2, the premeditated, willful and deliberate attempted murders of Jashan and Keith, respectively. (Pen. Code, §§ 187, subd. (a), 664).[9] As to the attempted murder of Jashan, the jury found true gun allegations under section 12022.53, subdivisions (b), (c) and (d), but only under subdivisions (b) and (c) as to the attempted murder of Keith, who was not injured. The jury found Lockridge guilty of count 3, assault with a firearm on Lemont (§ 245, subd. (a)(2)) and found true a gun allegation (§ 12022.5, subd. (a)). Lockridge was also found guilty of count 4, shooting at an occupied motor vehicle (§ 246), and the jury found true gun allegations (§ 12022.53, subds. (b), (c) & (d)). The jury found true gang allegations as to all counts (§ 186.22, subd. (b)(1)(C)).

The same jury found Love also guilty of counts 1 and 2, premeditated, willful and deliberate attempted murder and found true the same gun allegations. The jury found him guilty of count 3, assault with a firearm and of count 4, shooting at an occupied motor vehicle. As to count 4, the jury found true gun enhancement allegations (§ 12022.53, subds. (b), (c) & (d)). The jury found true gang allegations as to all counts (§ 186.22, subd. (b)(1)(C)).

On May 21, 2013, the trial court sentenced Lockridge as follows: count 1, life with a 15-year minimum term before parole eligibility (§ 186.22, subd. (b)(5)), plus 25

---

[8] Lockridge carried a gun because of a prior incident.

[9] All further undesignated statutory references are to the Penal Code.

5

years to life (§ 12022.53, subd. (d)); count 2, a consecutive life term plus 20 years to life (§ 12022.53, subd. (c)); count 3, a consecutive three-year-term plus 4 years (§ 12022.5); and count 4, 15 years to life plus 25 years to life (§ 12022.53, subd. (d)), stayed under section 654.

Love was also sentenced on May 21, 2013 as follows: on count 1, life with a 15-year minimum term before parole eligibility, plus 25 years to life (§ 12022.53, subd. (d)); on count 2, a concurrent life term plus 20 years to life (§ 12022.53, subd. (c)); count 3, a concurrent three years plus 4 years (§ 12022.5); and count 4, 15 years to life, plus 25 years to life (§ 12022.53, subd. (d)), stayed under section 654.

## DISCUSSION

### I.     There is sufficient evidence to support Love's conviction for premeditated, willful and deliberate attempted murder.

Love contends there is insufficient evidence to support his conviction, as an aider and abettor, for premeditated, willful and deliberate attempted murder. His argument is twofold: first, there is insufficient evidence he had the specific intent to kill Jashan and Keith; and, second, there is insufficient evidence of premeditation, willfulness and deliberation. We disagree with both arguments.

In assessing the sufficiency of the evidence to support a conviction, "we review the whole record to determine whether *any* rational trier of fact could have found the essential elements of the crime or special circumstances beyond a reasonable doubt. [Citation.] The record must disclose substantial evidence to support the verdict—i.e., evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence. [Citation.] 'Conflicts and even testimony [that] is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.] We

6

resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence. [Citation.]' [Citation.] A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support" ' the jury's verdict. [Citation.]" (*People v. Zamudio* (2008) 43 Cal.4th 327, 357; see also *Jackson v. Virginia* (1979) 443 U.S. 307; *People v. Perez* (1992) 2 Cal.4th 1117, 1124; *People v. Snow* (2003) 30 Cal.4th 43, 66.)

Love first argues that there is insufficient evidence of his intent to kill Jashan and Keith. Attempted murder is a specific intent crime, requiring "the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing." (*People v. Lee* (2003) 31 Cal.4th 613, 623; see also *People v. Smith* (2005) 37 Cal.4th 733, 739.) One who aids and abets an attempted murder must act "with knowledge of the criminal purpose of the perpetrator and with an intent or purpose either of committing, or of encouraging or facilitating commission of, the offense." (*People v. Beeman* (1984) 35 Cal.3d 547, 560, italics omitted; see also *People v. Prettyman* (1996) 14 Cal.4th 248, 259.) "Thus, to be guilty of attempted murder as an aider and abettor, a person must give aid or encouragement with knowledge of the direct perpetrator's intent to kill and with the purpose of facilitating the direct perpetrator's accomplishment of the intended killing—which means that the person guilty of attempted murder as an aider and abettor must intend to kill." (*Lee*, at p. 624.)

There is sufficient evidence of Love's intent to kill. First, defendants' membership in a common gang is relevant to motive and intent. (*People v. Garcia* (2008) 168 Cal.App.4th 261, 277-278; but see *Mitchell v. Prunty* (9th Cir.1997) 107 F.3d 1337, 1342, overruled on another ground by *Santamaria v. Horsley* (9th Cir.1998) 133 F.3d 1242, 1248; *People v. Gonzalez* (2005) 126 Cal.App.4th 1539, 1549-1551.) Love and Lockridge were members of 99 Mafia Crips, and the gang expert testified that gang members protect their territory, sometimes using violence. That Love was a gang member therefore showed he intended to harm rival gang members, or people perceived to be "in the wrong hood." Second, Love made statements evidencing an intent to kill. Either Lockridge alone or Lockridge and Love referred to 99 Mafia, and Lockridge asked

7

Desean to roll up his sleeves. When Lockridge said he should "pop" them, Love cautioned, " 'No, it's cameras.' " Although Love's statement is open to the interpretation he was telling Lockridge not to shoot, it can also be interpreted as a caution, or encouragement, to Lockridge to wait until they got outside. That Love intended the Bradley brothers not to leave unharmed is shown by his statement, they " 'don't get a pass.' " In keeping with his intent they not get a "pass," Love, with Lockridge, waited outside for Jashan and Desean, and Love aided Lockridge by hitting Desean.

Next, Love argues there is insufficient evidence to support the finding that the attempted murders were premeditated, willful and deliberate. To be found guilty of willful, deliberate and premeditated attempted murder, an aider and abettor need not personally act willfully, deliberately and with premeditation. (*People v. Lee, supra,* 31 Cal.4th at pp. 616, 623; *People v. Favor* (2012) 54 Cal.4th 868, 877.) Section 664 " 'makes no distinction between an attempted murderer who is guilty as a direct perpetrator and an attempted murderer who is guilty as an aider and abettor' and does not require personal willfulness, deliberation, and premeditation of an attempted murderer. [Citation.] Thus, premeditation is not a required component of the aider and abettor's mental state." (*Favor*, at p. 877.) Therefore, although evidence that Love personally premeditated and deliberated is relevant, it is not necessary to uphold the true finding on the allegation. The jury's finding will be upheld if there is sufficient evidence that Lockridge premeditated and deliberated.

" 'Deliberation' refers to careful weighing of considerations in forming a course of action; 'premeditation' means thought over in advance. [Citations.] 'The process of premeditation and deliberation does not require any extended period of time. "The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly. . . ." [Citations.]' [Citation.]" (*People v. Koontz* (2002) 27 Cal.4th 1041, 1080.) There are three basic, but not exhaustive, categories of evidence that will sustain a finding of premeditation and deliberation: (1) planning activity; (2) motive; and (3) manner of the killing. (*People v. Anderson* (1968) 70 Cal.2d 15, 26-27; see also

8

*People v. Perez, supra,* 2 Cal.4th at p. 1125.) All factors need not be present to sustain a finding of premeditation and deliberation. (*People v. Pride* (1992) 3 Cal.4th 195, 247.) "A first degree murder conviction will be upheld when there is extremely strong evidence of planning, or when there is evidence of motive with evidence of either planning or manner." (*People v. Romero* (2008) 44 Cal.4th 386, 401.)

All three *Anderson* factors are present here. There is planning evidence. Lockridge and Love arrived at the liquor store together, Lockridge armed with a gun. Jashan also saw the outline of a gun in Love's waistband. (See, e.g., *People v. Lee* (2011) 51 Cal.4th 620, 636 [the defendant's possession of a loaded gun on the night of the murder indicates he "considered the possibility of a violent encounter"].) When Lockridge said he should "pop" them, Love warned him about the cameras. He and Lockridge therefore waited outside for Desean and the Bradleys.

Defendants also had a motive to kill the Bradley brothers and Desean. Love and Lockridge were in 99 Mafia Crips, and the Bradley brothers and Desean were, in Lockridge's words, " 'in the wrong hood.' " Lockridge provided another motive for the attempted murders: Love and Desean had some kind of "prior experience," and neither the prosecution nor the defense disputed that some kind of altercation took place between the two men outside. They simply disputed who started it.

Finally, the manner of killing showed premeditation and deliberation. Love and Lockridge waited until they were outside the store before Love hit Desean. Surveillance from outside the store does not show that altercation, but it does show the Bradley brothers going to their cars. While Love stood nearby, Lockridge walked by the Bradley brothers, turned his head to them, pulled out a gun, pointed it in the Bradley brothers' direction, and fired. The video, although open to interpretation, certainly supports the view that Love's and Lockridge's actions were deliberate.

We therefore conclude that there is sufficient evidence to support Love's conviction of premeditated, willful and deliberate attempted murder.

9

## II. Instructional error.

The jury found true the allegations that the attempted murders of Jashan and Keith were premeditated, deliberate and willful (counts 1 and 2). The jury made those findings, however, without the benefit of instruction on the allegations. Both defendants therefore contend that their due process rights were violated. (U.S. Const., 6th & 14th Amends.) We agree that the true findings on those counts must be reversed.

"It is settled that, even in the absence of a request, a trial court must instruct on general principles of law that are commonly or closely and openly connected to the facts before the court and that are necessary for the jury's understanding of the case." [10] (*People v. Montoya* (1994) 7 Cal.4th 1027, 1047; see also *People v. Moye* (2009) 47 Cal.4th 537, 548; *People v. Breverman* (1998) 19 Cal.4th 142, 154.) In addition to instruction on the elements of the charged offense, a court has a sua sponte duty to define any term that has a specific technical legal meaning different from its common meaning. (*People v. Elam* (2001) 91 Cal.App.4th 298, 307; *People v. Ryan* (1999) 76 Cal.App.4th 1304, 1318-1319; *People v. McCleod* (1997) 55 Cal.App.4th 1205, 1216.)

"Deliberate" has been defined as " 'formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action.' " (*People v. Perez, supra,* 2 Cal.4th at p. 1123.) "Premeditation" has been defined as " 'considered beforehand.' " (*Ibid.*) "Premeditation and deliberation can occur in a brief interval." (*People v. Memro* (1995) 11 Cal.4th 786, 862-863, overruled on other grounds in *People v. Gaines* (2009) 46 Cal.4th 172, 181, fn. 2.)

Based on these principles, CALCRIM No. 601 instructs a jury: "If you find the defendant guilty of attempted murder [under Count __], you must then decide whether the People have proved the additional allegation that the attempted murder was done willfully, and with deliberation and premeditation. [¶] (The defendant/ _____ *<insert name or description of principal if not defendant>*) acted *willfully* if (he/she) intended to kill when (he/she) acted. (The defendant/ _____ *<insert name or*

---

[10] The omission of CALCRIM No. 601 appears to be inadvertent, because the trial court referred to it while discussing jury instructions.

*description of principal if not defendant>) deliberated* if (he/she) carefully weighed the considerations for and against (his/her) choice and, knowing the consequences, decided to kill. (The defendant _____ *<insert name or description of principal if not defendant>) premeditated* if (he/she) decided to kill before acting. [¶] [The attempted murder was done willfully and with deliberation and premeditation if either the defendant or _____ *<insert name or description of principal>* or both of them acted with that state of mind.] [¶] The length of time the person spends considering whether to kill does not alone determine whether the attempted killing is deliberate and premeditated. The amount of time required for deliberation and premeditation may vary from person to person and according to the circumstances. A decision to kill made rashly, impulsively, or without careful consideration of the choice and its consequences is not deliberate and premeditated. On the other hand, a cold, calculated decision to kill can be reached quickly. The test is the extent of the reflection, not the length of time. [¶] The People have the burden of proving this allegation beyond a reasonable doubt. If the People have not met this burden, you must find this allegation has not been proved." (See also Bench Note to CALCRIM No. 601 (2006) p. 369 [advising trial courts to give the instruction sua sponte]; CALJIC No. 8.67, Attempted Murder—Willful, Deliberate, and Premeditated.)

A true finding on a premeditation allegation makes the crime of attempted murder punishable by imprisonment for life with the possibility of parole (§ 664, subd. (a)); otherwise, the punishment for attempted murder is a determinate term of five, seven or nine years.[11] The section 664, subdivision (a) penalty provision is an element of the offense because it exposes a defendant to a greater punishment than that authorized by the jury's verdict and " 'goes precisely to what happened in the "commission of the offense." ' " (*People v. Seel* (2004) 34 Cal.4th 535, 549.)

The parties agree that the trial court had a sua sponte duty to instruct the jury on premeditation, willfulness and deliberation. The parties also agree that the failure to

---

[11]     Here, defendants were sentenced to life with a 15-year minimum parole eligibility date because of the true finding on the gang allegation (§ 186.22, subd. (b)(1)(C)).

instruct is reviewed under *Chapman v. California* (1967) 386 U.S. 18, 24; namely, reversal is required unless the error is harmless beyond a reasonable doubt. But the parties disagree whether the error was prejudicial. Based on our review of the instructions and the evidence as a whole, we conclude that the error was prejudicial.

Other instructions did not cover the concept of premeditation, deliberation, and willfulness. Although the People point to CALCRIM Nos. 252 and 600,[12] those instructions merely refer to an "intent to kill." "Intent to kill" and "premeditation and deliberation," however, are different legal concepts. One can intend to kill but not premeditate and deliberate; hence, there are degrees of murder. (§ 189 [willful, deliberate, and premeditated murder is murder in the first degree]; *People v. Robertson* (2004) 34 Cal.4th 156, 164 [second degree murder is committed with malice aforethought without the elements of willfulness, deliberation and premeditation], overruled on other grounds in *People v. Chun* (2009) 45 Cal.4th 1172, 1200-1201.) "[A] mere unconsidered and rash impulse, even though it includes an intent to kill, is not deliberation and premeditation as will fix an unlawful killing as murder of the first degree." (CALJIC No. 8.20.) And although we may consider the arguments of counsel in assessing the probable impact of the instruction on the jury (*People v. Young* (2005) 34 Cal.4th 1149, 1202), a prosecutor's closing arguments is no substitute for proper instruction.[13]

---

[12] CALCRIM No. 252 states, in part, that the specific intent required for attempted murder is intent to kill.

CALCRIM No. 600 provides: "A *direct step* requires more than merely planning or preparing to commit murder or obtaining or arranging for something needed to commit murder. A direct step is one that goes beyond planning or preparation and shows that a person is putting his or her plan into action. A direct step indicates a definite and unambiguous intent to kill. It is a direct movement toward the commission of the crime after preparations are made. It is an immediate step that puts the plan in motion so that the plan would have been completed if some circumstance outside the plan had not interrupted the attempt."

[13] The prosecutor said this about premeditation in his closing argument: "And, obviously, in attempt murder we have some action that's ineffective in killing somebody, with the intent to kill. [¶] Now, in addition to that—I'm calling this an allegation, but it's really part of it, but it's a separate finding. That the intent to kill was willful,

12

Our conclusion that there was sufficient evidence defendants premeditated and deliberated does not lead us to conclude that the failure to instruct the jury with CALCRIM No. 601 or its equivalent was harmless beyond a reasonable doubt. Lockridge disputed the Bradley brothers' version of events, denying he asked where they were from or otherwise referred to 99 Mafia Crips. He also testified that Desean raised his sleeves in response to Lockridge's friendly inquiry about his tattoos. Outside, it was Desean who instigated an altercation with Love. In response, one of the Bradley brothers said, "grab the gun," and Lockridge saw them open the trunk of their car. Lockridge shot his gun to protect himself.

The video surveillance footage, which lacks audio, is open to interpretation. It shows Desean pulling up his sleeves. It does not show whether Love hit Desean (as the

---

deliberate, and premeditated. And there are often misconceptions about this, because we hear about premeditated murders, right, murders that were planned months in advance, and meticulously planned. Clearly, [that] is not what this is. [¶] But I'm going [to] tell you why it still falls into this. [¶] Willful means on purpose, and deliberate acknowledges some thought process behind it. [¶] We've all seen these things when we drive, or are being driven, stop signs, stop lights. And when you're driving and all of a sudden you hit a—let's talk about a light changes to yellow. Okay. When you've got a green light and all of a sudden it changes to yellow, you think about certain things, right? Am I going to make it through this intersection or should I stop? You look to the left. You look to the right. You consider various factors. Is it safe to proceed through the intersection? Maybe you make a decision and go forward, maybe you don't. Nowadays you look for those red light cameras, even though I think they're getting rid of most of those. But you make those decisions every day. [¶] And what you did in the split second, literally it's a split second, is deliberation. Is it safe to do what I'm about to do, enter the intersection? And it involved premeditation, because you waited before and after? [¶] Now, this defendant's premeditation, deliberation, going back to planning, started way back before he even got there. I mean, at some point he had to get the gun, which we know he did, load the gun, each bullet, put the magazine in, rack a round and make sure it was loaded, put it in his pants. He had plenty of time in this store to know what was going down, what was going to happen, from the time he stepped in there and saw somebody, saw people in his hood. [¶] He had plenty of time to deliberate, to premeditate, and to take the willful action that he did. There was also—and, obviously, we don't have sounds in the video, but you can see it. There is plenty of time to communicate between defendant Love and Lockridge. There were multiple times—you saw them together in the video—both inside and outside the store."

13

Bradley brothers claimed) or Desean spat in Love's face (as Lockridge claimed). It also shows, as Lockridge testified, two of the Bradley brothers quickly opening and closing the trunk of their car, and Lockridge walking past, pulling out a gun and shooting it in the brothers' direction. Love was not next to Lockridge when he started shooting; Love was behind Lockridge with Cardwell, and they both ducked and ran when Lockridge started shooting.

The jury rejected the self-defense theories, both perfect and imperfect. But the jury could have rejected those defenses and still found that the shooting resulted from a rash and impulsive decision rather than a cold and calculated one. We therefore reverse the true findings on the section 664, subdivision (a), allegations as to counts 1 and 2. On remand, the allegations may be retried (see *People v. Anderson* (2009) 47 Cal.4th 92, 102-103). If the People elect not to retry the allegations, then the trial court must resentence defendants on those counts to a determinate term as provided in section 664, subdivision (a).[14]

## II.    CALCRIM No. 1403.

Without objection from defense counsel, the trial court instructed the jury with CALCRIM No. 1403 regarding the uses of gang evidence. Lockridge now contends that the instruction "violates due process of law because it diminishes the prosecutor's burden" of proof and allowed the jury to consider "speculative character trait evidence." We conclude that the trial court did not err by giving the instruction, and therefore no due process violation occurred.

The jury was told: "You may consider evidence of gang activity only for the limited purpose of deciding whether [¶] the defendant acted with the intent, purpose, and knowledge that are required to prove the gang[-]related crimes and enhancements charged, or [¶] that the defendant had [a] motive to commit the crimes charged, or [¶] the

---

[14]    Because we reverse and remand for further proceedings as to counts 1 and 2, we need not correct the errors in the abstracts of judgment inaccurately stating that Love was sentenced to life without the possibility of parole on count 1 and Lockridge was sentenced to life without the possibility of parole on counts 1 and 2.

defendant actually believed in the need to defend himself, or [¶] the defendant acted in [the] heat of passion. [¶] . . . *[Y]ou may also consider this evidence when you evaluate the credibility or believability of a witness and when you consider the facts and information relied on by an expert [witness] in reaching his or her opinion.* [¶] You may not consider this evidence for any other purpose. You may not conclude from [this] evidence that the defendant is a person of bad character, or that he has a disposition to commit the crime." (Italics added.)

Lockridge's challenge to this instruction focuses on the italicized language regarding a witness's credibility. In evaluating a purportedly erroneous instruction, we ask whether, in the context of the entire charge, there is a reasonable likelihood the jury improperly applied the instruction. (*People v. Castaneda* (2011) 51 Cal.4th 1292, 1320-1321.) Instructional error that does not impair a federal constitutional right requires reversal only if it is reasonably probable that a properly instructed jury would have returned a verdict more favorable to the appellant. (*People v. Rogers* (2006) 39 Cal.4th 826, 875; *People v. Watson* (1956) 46 Cal.2d 818, 836.)

As we have pointed out, a defendant's membership in a gang may be relevant to, for example, his motive to commit a crime. (See generally, *People v. Hernandez* (2004) 33 Cal.4th 1040, 1051-1053; *People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1169-1170.) Gang evidence is also relevant on the issue of witness credibility, for example, where it might explain a witness's reluctance to testify or inconsistent statements. (*Samaniego*, at pp. 1169-1170.)

Although a witness's reluctance to testify or inconsistent statements were not an issue here, the gang evidence, nonetheless, was relevant to Lockridge's credibility. It went to his version of the events that he acted in self-defense. He testified, for example, that he did not issue gang challenges to Desean and the Bradley brothers. Desean rolled up his sleeves because Lockridge was interested in seeing his tattoos and not because Lockridge wanted to know if Desean was from a rival gang. Lockridge only shot at the Bradley brothers to protect himself, because he thought they were going to shoot him.

15

The gang expert, however, testified that Lockridge and Love were 99 Mafia gang members who protect their territory from outsiders, using violence to do so. The gang evidence therefore was relevant to, for example, why Desean would pull up his sleeves and why Lockridge shot at the Bradleys. Using gang evidence in this manner, as one factor in evaluating a witness's credibility, is different than using it as evidence that the defendant was criminally disposed. Here, for example, the jury could not conclude that Lockridge was criminally disposed merely because he belonged to the 99 Mafia Crips. But it could consider the gang evidence to evaluate his explanation of events.

CALCRIM No. 1403 is therefore an accurate statement of the law on the limited admission of gang evidence. The instruction cautioned jurors that they could not use gang evidence to conclude defendant was a person of bad character or had a criminal disposition. We presume that the jury followed the instruction not to equate defendant's gang membership with bad character. (*People v. Yeoman* (2003) 31 Cal.4th 93, 139.)

Having found no error, we reject Lockridge's contention that his due process rights were violated.

## IV.    Cumulative error.

Lockridge contends that the cumulative effect of the purported errors deprived him of a fair trial. We have found error only in the failure to instruct the jury on premeditation, willfulness and deliberation. We have otherwise rejected on the merits the remaining claims of error. (*People v. Cole* (2004) 33 Cal.4th 1158, 1235-1236; *People v. Butler* (2009) 46 Cal.4th 847, 885.) The single instance of error we have found does not amount to cumulative error.

16

## DISPOSITION

The judgment as to counts 1 and 2 is reversed and remanded for proceedings consistent with the views expressed in this opinion. The judgment is otherwise affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

ALDRICH, J.

We concur:

CROSKEY, Acting P. J.

KITCHING, J.